UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application for the Determination of Interim License Fees for<br><br>THE CROMWELL GROUP, INC. AND AFFILIATES, ET AL. | No. 10 CV 0167 (DLC) (MHD)<br><br>ECF Case |
| Related to<br><br>UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,<br><br>        Defendant. | No. 41 CV 1395 (DLC) (MHD) |

**MEMORANDUM OF LAW OF CROMWELL GROUP, INC. AND AFFILIATES, ET AL. IN SUPPORT OF APPLICATION FOR INTERIM FEE DETERMINATION**

R. Bruce Rich (RR 0313)
Jonathan Bloom (JB 7966)
Heather R. Solow (HRS 8680)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

*Counsel for the Radio Music License Committee and The Cromwell Group, Inc. and Affiliates, et al.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ……………………………………………………1

FACTUAL BACKGROUND ……………………………………………………6

    The Parties ……………………………………………………………6

    The 2004 ASCAP Radio Station License Agreement ……………………7

        A. The Antecedent Agreement with BMI ……………………………..7

        B. The ASCAP Negotiations and Resulting Agreement ………………9

    Developments Subsequent to the 2004 Agreement ……………………..11

    Outlook for the Foreseeable Future ………………………………..13

    Scope of Rights ………………………………………………………14

ARGUMENT ………………………………………………………………15

APPLICANTS' PROPOSED INTERIM FEE ……………………….……………21

CONCLUSION ………………………………………………………………23

# TABLE OF AUTHORITIES

**Page(s)**

United States v. Am. Soc'y of Composers, Authors and Publishers, Second
Amended Final Judgment, Civ. No. 41-1395 (WCC) (S.D.N.Y.
June 11, 2001) ………………………………………………………...1, 2, 15

United States v. Am. Soc'y of Composers, Authors and Publishers
(In the Matter of Application of Amercan Broadcasting Co., Inc.), Civ.
No. 13-95 (ELP), 1982 U.S. Dist. LEXIS 13411 (S.D.N.Y. May 26, 1982) ………...18

United States v. Am. Soc'y of Composers, Authors and Publishers
(In the Matter of the Application of Capital Cities/ABC, Inc. and CBS, Inc.),
831 F. Supp. 137 (S.D.N.Y. 1993) ………..………………………….........……………16

United States v. Am. Soc'y of Composers, Authors and Publishers
(In the Matter of the Application of Home Box Office, Inc.), Memorandum and
Order, Civ. No. 13-95 (WCC) (S.D.N.Y. July 11, 1986) ..........................16, 17, 18, 19

United States v. Am. Soc'y of Composers, Authors and Publishers
(In the Matter of Muzak Ltd. P'ship), Civ.  No. 13-95 (WCC), 1992 U.S. Dist.
LEXIS 8018 (S.D.N.Y. June 10, 1992) ...……………………………….....……....16

United States v. Am. Soc'y of Composers, Authors and Publishers
(In the Matter of the Application of Showtime/The Movie Channel, Inc.),
Civ. No. 13-95 (WCC), 1989 WL 222654 (S.D.N.Y. Dec. 20, 1989) …………….…..18

The Cromwell Group, Inc. and Affiliates, on its own behalf and on behalf of thousands of commercial radio broadcast station owners nationwide represented by the Radio Music License Committee (RMLC) (collectively, "Applicants"), hereby submit their interim fee position in support of their Application,[1] pursuant to Article IX(F) of the Second Amended Final Judgment, United States v. Am. Soc'y of Composers, Authors and Publishers, Civ. No. 41-1395 (S.D.N.Y. June 11, 2001) ("AFJ2"), for a determination of interim license fees for public performances of musical works in the repertory of the American Society of Composers, Authors and Publishers (ASCAP) as are encompassed by the RMLC license request dated December 11, 2009 (attached as Exhibit 1 to the Application).

### PRELIMINARY STATEMENT

The Application arises out of the inability of ASCAP and the U.S. local commercial broadcast radio industry, represented by the RMLC, to agree upon the terms of a new license for performances of works in the ASCAP repertory for the period beginning January 1, 2010.  Negotiations that began in early 2009 left the parties hundreds of millions of dollars apart and thus left the industry with no choice but to invoke the aid of this Court to secure relief from fees that have become inordinately burdensome with the unforeseen precipitous decline in radio industry revenues during the recent economic crisis.

---

[1] The "Application" refers to the Joint Application for the Determination of Interim License Fees for the Cromwell Group, Inc. and Affiliates, et al., filed jointly by Applicants and ASCAP on January 8, 2010.

Given the wide and seemingly unbridgeable gap between the parties' respective conceptions of reasonable industry-wide fees for blanket and per-program licenses, it likely will fall to the Court to determine final fees following initiation by Applicants of a final rate proceeding within the time period contemplated by the provisions of Article IX(A) of AFJ2.[2]  In advance of that filing and eventual determination, however, the parties have agreed that it is appropriate for the Court to fix interim fees, to remain in effect until final fees are determined, which interim fees will be subject to retroactive adjustment at that time.  Although the parties have agreed to provisional interim fees to fill the gap until interim fees take effect, they have been unable to agree upon interim fees.[3]  At least from the standpoint of Applicants, the agreement as to provisional fees was strictly a stop-gap measure designed to accommodate ASCAP's desire to maintain its cash flow into 2010 even as the parties pursued rate court relief.  Those fees were not intended to serve as substitutes for interim fees as set by the Court.[4]

---

[2] Article IX(A) provides for commencement of such a proceeding following 60 days from the later of (a) the date of an Applicant's written request for fee quotations (here, December 11, 2009) or (b) ASCAP's request for such further information as it "reasonably requires in order to quote a reasonable fee."  Counsel for ASCAP has advised Applicants' counsel that it intends to seek such further information, although to date Applicants have not received any such request.

[3] The agreed-to provisional interim fees are to remain in effect until interim fees are determined or July 1, 2010, whichever is earlier.

[4] See Declaration of Edward K. Christian, dated February 25, 2010 ("Christian Decl."), filed herewith, ¶ 13.

2

As detailed below and in the accompanying affidavits and declarations,[5] Applicants are seeking a significant interim reduction from the fees the radio industry was contractually obligated to pay during calendar year 2009. The primary justification for the reduction is the dramatically changed economic circumstances that have come about since the prior license agreement was negotiated. A secondary reason is that, in any event, the fixed dollar amount that the parties allocated for payment during 2009 was expressly agreed to be arbitrary, as opposed to representing the parties' agreement as to a reasonable fee for that year.

In 2004, the radio industry agreed to pay ASCAP just over $1.7 billion (allocated in escalating annual sums) for blanket and per-program licenses covering the years 2001 through 2009. This agreement reflected a departure from prior radio industry licenses, which had been priced based on stipulated percentages of station revenues. The most recent such license, covering the 1996-2000 period, called for payments at the rate of 1.615% of adjusted station revenues. As of the early 2000s, the industry believed that moving off a percentage-of-revenue fee formula – a fee structure that effectively made ASCAP (as well as its principal competitor, Broadcast Music, Inc. (BMI)) a partner in revenue growth that was not attributable to performances of music – was desirable. Working through its industry committee (the RMLC) and with economists, the industry projected total fees for the period contemplated by the next licenses with ASCAP and BMI that would roughly approximate those that the industry would have paid had the

---

[5] See Christian Decl.; Affidavit of Keith F. Meehan, dated February 24, 2010 ("Meehan Aff."), filed herewith; Affidavit of Richard F. Cummings, dated February 24, 2010 ("Cummings Aff."), filed herewith; Declaration of John P. Bigelow, dated February 26, 2010 ("Bigelow Decl."), filed herewith.

existing percentage-of-revenue fee (1.615% as to ASCAP) been continued. To make these projections, the RMLC and its consultants used contemporaneous forecasts as to radio industry revenue growth over the terms of these licenses. Acting first with BMI and next with ASCAP, the industry entered into licenses whose cumulative fees over their terms reflected those projections.

But the anticipated revenue growth on which the 2003 BMI agreement and the 2004 ASCAP agreement were predicated failed to materialize. Instead, revenues leveled off beginning in 2004, started to decline in 2007, and then turned sharply downward in 2008 and 2009, ultimately declining by more than 27% over the license term. This wrenching drop in revenue – unprecedented in the history of the radio industry – produced a gap of nearly $300 million between what the industry would have paid under the prior percentage-of-revenue fee and what it actually paid under the 2004 deal. Instead of receiving the dollar equivalent of historic industry payments at a level of 1.615% of adjusted revenue, ASCAP will have received an average of approximately 2% of adjusted revenue over the life of the agreement, and if the fees allocated to 2009 were to be perpetuated, they would generate fees in excess of 3% of adjusted revenue on an ongoing basis (an 89% increase).

Applicants' affiants attest to the consequences to individual radio broadcasters of the unforeseen collapse in advertising revenues – ranging from painful cost-cutting to stock exchange delistings and, in some cases, bankruptcy filings. To reward ASCAP with a fee windfall of more than 89% on an ongoing basis in these circumstances would be completely unwarranted.

The economic distress facing the radio industry and the unanticipated turn of events that brought it about present the quintessential case for interim fee relief. This Court's precedents dictate that in setting interim fees the Court should be guided by current market conditions and not give undue weight to a prior agreement that proved extremely unfavorable to one of the parties. The rationale for the presumption that the most recent agreed-to fee level should be continued on an interim basis – that it is the best proxy for a current market rate – clearly does not hold here: knowing what it knows today the RMLC never would have agreed to anything close to the fees it agreed to for 2001-2009. Closely analogous facts have in prior proceedings led the Court to order a significant interim fee reduction.

No other factor should, at this stage, prevent the Court from granting Applicants the interim relief they seek. While it is true that the scope of the rights to be covered by the instant proceeding is somewhat broader than the scope of the 2004 license insofar as it now includes the "new media" platforms the radio industry has begun to explore, as we demonstrate, the economic magnitude of this still-nascent area of business expansion is far too small to be material to the Court's interim fee analysis. ASCAP's effort to suggest that the "new media" tail should wag the "traditional broadcast/simulcast" dog should be rejected.

In the Bigelow declaration, we present the economic case for an interim fee of $10,801,932 per month ($129.6 million on an annualized basis) – derived by applying 1.615% to an estimate of the industry's actual (as opposed to earlier projected) revenues and adding 5% to account for "new media" uses covered by the Application but not by the 2004 license. This proposed interim fee would, at least in the short term, reset

5

the fees to a level commensurate with the parties' expectations in 2004 and would

materially ease a financial burden the industry can ill afford in the current economy.[6]

## FACTUAL BACKGROUND

**The Parties**

ASCAP represents the musical works of some 370,000 composer and

publisher members.  Its repertory contains millions of copyrighted musical works in all

genres.  ASCAP is an unincorporated association and distributes all royalties collected

for the public performance of its members' musical works, less expenses and reasonable

reserves, to its members.  See Application ¶ 1.

The RMLC represents the collective interests of the majority of

commercial radio stations in the United States in connection with music licensing

matters.  To that end, the RMLC negotiates and/or manages litigation in proceedings such

as this over license fees for the public performance of music by local commercial

broadcast radio broadcasters throughout the country.  Historically, most U.S. commercial

radio stations have either expressly authorized the RMLC to negotiate and/or litigate with

ASCAP on their behalf or have agreed to be bound by the outcome of the ASCAP/RMLC

negotiations or court proceedings.  As a result, following the conclusion of rate-setting

proceedings between the RMLC and ASCAP, thousands of radio stations have entered

---

[6] Additional, interrelated factors bearing on reasonable fees as to which Applicants have
not yet developed a factual record at this stage of the proceeding include: (1) a decline in
the number of radio listeners and in time spent listening; (2) an increase in the number of
substitutes for terrestrial radio (Internet radio, satellite radio, MP3 players); and (3)
decreased music use by radio broadcasters with a shift away from music formats.  Also
remaining for later determination are the proper fee interrelationship between the blanket
and per-program licenses and the structure and pricing of a blanket license with fee
credits to reflect direct licensing by individual Applicants of ASCAP music.

into license agreements with ASCAP based on the outcome of such proceedings. See Application ¶ 2.

**The 2004 ASCAP Radio Station License Agreement**

The central issue in this interim fee proceeding is whether the parties' 2001-2009 license agreement – a deal made in 2004 under very different economic conditions – provides a reasonable benchmark for interim fees for the period beginning January 1, 2010. A recounting of the history of that license reveals why it does not.

**A. The Antecedent Agreement with BMI**

In 2003 – the year before it entered into the most recent license with ASCAP – the RMLC agreed to terms of radio industry blanket and per-program licenses with BMI covering the 1997-2006 time period.[7]  BMI is a prominent and direct competitor of ASCAP's from the standpoint of representing composers and music publishers and their musical works and catalogs.[8]  The 2003 BMI agreement was the first in the long course of dealings between the performing rights organizations and the radio industry that provided for flat annual industry-wide payments in lieu of payments based on stipulated percentages of broadcaster advertising revenues. The prior BMI agreement

---

[7] Following several years of rate litigation, the terms and fees were agreed to in principle in late 2002 and finalized in 2003 (with approval from the Court on September 15, 2003). See Meehan Aff. ¶ 11.

[8] Like ASCAP, BMI's repertory contains millions of musical compositions. Because of the manner in which ASCAP and BMI are organized, radio broadcasters must maintain licenses from both organizations. See Meehan Aff. ¶ 6.

had called for blanket license fees at the level of 1.605% of adjusted station revenues (or some 1.4% of station gross revenues).[9]  See Meehan Aff. ¶ 7.

At the time of the BMI negotiations, the RMLC sought to move off of this historic revenue-based fee structure based on the belief and expectation that industry-wide revenues would continue to grow at healthy annual rates and that much that was driving revenue growth, most especially industry consolidation, had little to do with radio stations' use of music.  See Meehan Aff. ¶ 8.  Accordingly, the RMLC had as its long-term goal a reduction in the effective percentages of industry revenues payable to ASCAP and BMI and set as its short-term goal converting the payment structure from one based on a percentage of revenue to a flat annual fee model – patterned after the fee structure that the local television industry had attained in recent years in its own license dealings with ASCAP and BMI.  Id. ¶¶ 8-9.

The RMLC recognized that to induce BMI (and ultimately ASCAP) to move off their preferred percentage-of-revenue fee structure, the industry would need to be prepared to offer a sum that would roughly approximate what those organizations could expect to receive under the prevailing percentage-of-revenue fee rates.  See Meehan Aff. ¶ 9.  Although the RMLC viewed a continuation of fees in the 1.6% range as higher than the reasonable value of the rights to the ASCAP and BMI repertories, it

---

[9] The 1.605% of revenue applied to stations with a blanket license from BMI.  BMI also offered stations a per-program alternative, priced beginning at 0.24% of adjusted station revenues, that was practically available to only non-music format stations.  See Meehan Aff. ¶ 7.  As Mr. Meehan attests, although the 1.605% rate was nominally different from the then-prevailing ASCAP rate of 1.615%, this was attributable to different allowable deductions, such that the effective rate, viewed as a percentage of station gross revenues, was essentially the same.  Id.

was willing to "make [ASCAP and BMI] whole, dollar-wise" in the short term to achieve an uncoupling of fees from escalating revenues that, it was thought, would eventually lead to significant savings for the industry.  Id.

BMI and the RMLC agreed to fees totaling approximately $1.046 billion for the years 2001-2006 and finalized fees already paid for the 1997-2000 period. Meehan Aff. ¶¶ 12-13.[10]  These fees were commensurate with the prior percentage-of-revenue rate as applied to revenues that (it was expected) would increase at the rate of approximately 7% per year, as forecast by leading industry experts, id. ¶¶ 10, 14, and as was consistent with the industry's historical growth rate.  See Bigelow Decl. ¶¶ 14-17. These forecasts were known to both BMI and the RMLC at the time of the negotiations. See Meehan Aff. ¶ 10.  In other words, the deal was designed such that had industry revenues grown at rates projected at the time of the agreement, the flat dollar payments owing to BMI over the life of the agreement would have been roughly equivalent to those that would have been generated by a continuation of the prior rate of 1.605% of adjusted industry revenues.  Id. ¶ 14.  The Committee would not have favorably recommended this license to the industry had it anticipated that industry revenue growth over the period of the license would be significantly lower than that forecast.  Id. ¶ 16.

### B. The ASCAP Negotiations and Resulting Agreement

Negotiations with ASCAP over licenses for the period beginning January 1, 2001 began in 2000 but were suspended and did not resume until 2003 – after the BMI

---

[10] The parties also agreed on an aggregate additional payment of $2 million – to be paid over the 2003-2006 period – for the stations' option simultaneously to stream their over-the-air broadcast signals over their Internet websites.  Meehan Aff. ¶ 15.

agreement was entered into – at which time the parties used the agreement with BMI as a template. Meehan Aff. ¶ 17. ASCAP did not at this point seriously oppose entering into licenses predicated on flat annual fees; the issue was the amount of such fees, and a major focus of the ASCAP negotiations was on the relative shares of radio music use as between ASCAP and BMI. Id.

      The agreement with ASCAP, reached in 2004, provided for total payments to ASCAP of $1,724,968,000 for the period January 1, 2001 through December 31, 2009, allocated in escalating annual fixed sums. See ASCAP 2004 Radio Station License Agreement (Sept. 15, 2004) (approved by the court on October 15, 2004) (copy annexed as Meehan Aff. Ex. 5, Ex. A). As had been the case with BMI, the agreement expressly provided, at the insistence of the RMLC, that the amounts allocated to each year were *not* meant to represent reasonable license fees for any particular year. See Meehan Aff. ¶¶ 13, 20 and Ex. 5, Ex. A at ¶ 7 ("By agreeing to an Industry-wide fee for the period 2001-2009, the parties have expressly not agreed that the Annual License Payment set forth herein comprises reasonable license fees for a particular year but instead reflect arbitrary yearly allocations for the convenience of both the Licensees and ASCAP.").

      The agreement covered industry-wide blanket and per-program licenses as well as simultaneous Internet streaming of stations' over-the-air signals.[11] For 2001-2003, the fees agreed to retroactively were those already collected by ASCAP under the

---

[11] Each station's fee was calculated in accordance with a formula developed by the RMLC based on fees previously paid by the stations to ASCAP and the size of the stations' average quarter-hour listening audience. Meehan Aff. Ex. 5, Ex. B.

prior percentage-of-revenue license, as continued by the parties consensually on an interim basis.[12]  Meehan Aff. ¶ 19.

The cumulative fees agreed to with ASCAP were roughly commensurate with those that would have been generated had the prior percentage-of-revenue rate (1.615% of adjusted revenues or some 1.4% of gross revenues) been applied to revenues that (it was expected) would increase at the approximate rate of 6% to 7% per year, based on the contemporaneous forecasts of industry experts as of 2003 into 2004.  See Meehan Aff. ¶¶ 18-20; Bigelow Decl. ¶ 40.

**Developments Subsequent to the 2004 Agreement**

Despite the industry's belief that the flat-fee agreements reached with BMI and ASCAP were an important step in the direction of containing the industry's long-term payments as a percentage of industry revenues, both deals proved disastrous, as the anticipated revenue growth on which the deals had been predicated did not materialize.  To the contrary, advertising revenues were flat beginning in 2004, declined slightly in 2007, and then dropped precipitously in 2008 and 2009 as the economy entered a severe recession.  Revenues increased by 1.95% in 2004, 0.45% in 2005, and 0.07% in 2006 before dropping by 2.92% in 2007, 10.49% in 2008, and an estimated 17.36% in 2009 – all told more than a 27% decline over the term of the license.  Bigelow Decl. ¶ 25.

As Dr. Bigelow demonstrates, this reversal of fortune for the radio industry produced a gap of nearly $300 million between what the industry actually paid under the ASCAP license and what it would have paid under the pre-existing percentage-

---

[12] The parties' 1996 agreement, pursuant to which the industry paid ASCAP 1.615% of revenues, expired on December 31, 2000.  Meehan Aff. ¶ 19 and Ex. 5 at 2.

of-revenue rate from which the actual license fee was derived. Bigelow Decl. ¶ 42. The economic effect of this turn of events was to reward ASCAP, over the term of the license, with fees approximating 2% of adjusted industry revenues, and for 2009 alone, with fees estimated to be over 3% of such revenue.

The written testimony from executives of representative radio broadcasters details the degree of financial distress in which the industry finds itself today. See generally Christian Decl.; Cummings Aff. Mr. Christian of Saga Communications Inc. ("Saga"), which owns 91 radio stations in 23 small- and mid-sized markets across the country, and Mr. Cummings of Emmis Communications Corp. ("Emmis"), which operates 23 stations in some of the larger markets across the country, attest to the adverse impact on their businesses of the recent sharp decline in radio advertising revenues. Mr. Cummings explains that Emmis has experienced the worst revenue decline in its history, with net radio division revenues dropping from $240 million in February 2007 to an expected $159 million by the end of February 2010. Cummings Aff. ¶¶ 5-6. This severe revenue contraction has forced Emmis to seek to cut costs wherever possible. The company has had to lay off 21% of its radio division employees and has cut salaries (by at least 8% – and more for senior executives) and employee benefits. Id. ¶ 10. Remaining employees have had to take on additional responsibilities, id. ¶ 11, and marketing and research expenditures have been reduced significantly. Id. ¶ 12.

Mr. Christian, who is also the chairman of the RMLC, likewise attests to the downturn being the most severe he has experienced in his almost 50 years in the radio industry. He explains that radio advertising prices have plummeted as advertisers hit hard by the recession have had to trim costs. Christian Decl. ¶¶ 4, 8. For its part, Saga's

radio net operating revenues declined by 4.4% from 2007 to 2008 and were down by more than 16% over the first three quarters of 2009.  Id. ¶ 10.  Saga has reduced spending by some $10 million a year, reduced personnel by 8% and salaries by 5% across the company, renegotiated vendor contracts, and suspended marketing and advertising efforts.  Id. ¶ 9.

The experience of Saga and Emmis has been echoed throughout the radio industry:

- Bureau of Labor Statistics employment figures for the radio broadcasting industry show that total employment in the industry fell by over 12% in the two years from December 2007 to December 2009.  Bigelow Decl. ¶ 34.

- In April 2009, Clear Channel Radio, the largest U.S. radio group, cut 590 jobs, including its entire corporate marketing division, which brought its total workforce cuts to 12% for the year.  Bigelow Decl. ¶ 31.  With these cuts, Clear Channel eliminated local on-air personalities in stations across the country, replacing them with less expensive syndicated programming, and also laid off production directors and producers at several stations.  Id.

- Citadel, the third largest radio group in the country, filed for bankruptcy on December 20, 2009 and was delisted from the New York Stock Exchange.  Clear Channel narrowly averted the same fate by selling $2.5 billion in bonds in mid December.  Bigelow Decl. ¶ 30.

**Outlook for the Foreseeable Future**

According to Kagan forecasts, recovery for the radio industry will be extremely slow.  By 2013, Kagan projects industry revenues to be up by only about 6.4%

13

over the 2009 forecast, with an up-tick of only 0.9% in 2010. Bigelow Decl. ¶ 44. Mr.

Christian sees only modest growth for Saga in 2010, and he is pessimistic that the

industry will ever return to the revenue heights of a decade ago. Christian Decl. ¶ 11. He

does not expect digital revenues to have a material impact on the bottom line, at least for

Saga. Id. ¶ 12. Emmis similarly is not projecting significant recovery for its U.S. radio

division in the foreseeable future. Cummings Aff. ¶ 16. Mr. Cummings also believes it

will be many years, if ever, before the industry returns to former peak revenue levels. Id.

**Scope of Rights**

The 2001-2009 ASCAP license that expired on December 31, 2009,

covered the following rights:

- On-air broadcasting of the station's primary broadcast signal;

- On-air broadcasting of the station's digital (high-definition and multicast) signals; and

- Simulcast streaming of the station's on-air signal from that station's websites.

See Meehan Aff. Ex. 5 at 3-4. In an effort to better mirror the current technological

environment, despite the fact that Internet and wireless streaming does not yet generate

significant revenue for the industry, for the term effective January 1, 2010 Applicants

have requested broader rights than are covered by the 2004 agreement. Specifically, they

seek a "through-to-the-listener" license from ASCAP covering

> whatever public performances of ASCAP-repertoire music
> occur in either (i) the Stations' (including any translators')
> transmissions to users for which an ASCAP license is
> required, however and whenever distributed, including,
> without limitation, all broadcast transmissions, digital
> transmissions, high-definition transmissions, and
> transmissions over Internet and wireless platforms or via

14

> any other platform capable of displaying or disseminating a
> Stations' transmissions or (ii) as applicable, the Station
> owners' radio division online or wireless transmissions.

December 11, 2009 license request (Application Ex. 1).

While we anticipate that the precise contours of these additional rights and the commercial activities they are designed to cover will be the source of considerable discovery as the litigation progresses through its final fee phase, there is nothing about this expanded rights grant application that need unduly complicate the Court's interim fee-setting task. This is because, as Dr. Bigelow and Mr. Cummings attest, the entirety of the radio industry's exploitations of the "new media," and any associated uses of ASCAP music, currently generate some 3% of total radio industry revenue. Furthermore, while industry analysts expect that these "new media" activities will continue to gradually grow, they are expected to amount to only 5% of these revenues by 2013. Bigelow Decl. ¶ 35.[13]

## **ARGUMENT**

The role of this Court, sitting as a rate court under Article IX of the AFJ2, is to determine "reasonable" fees for the public performance of musical works in the ASCAP repertory. Article IX(F) of the AFJ2 authorizes the Court to set an interim fee pending final determination or negotiation of a final fee. It further provides that in fixing

---

[13] Consistent with this, Mr. Cummings states that he does not anticipate "new media" revenues to grow significantly, at least not during the next license term, given the heavy investment necessary for Internet and wireless applications. Cummings Aff. ¶ 14. For its part, Saga does not expect revenues from digital media to have a material effect on its financial performance in the foreseeable future. Christian Decl. ¶ 12.

the interim fee, "there shall be a presumption that the last existing license . . . between the music user and ASCAP . . . sets forth the appropriate interim fee."

That presumption rests on the assumption that, in advance of a fully developed record, the fees the parties agreed to for the most recent license are the best benchmark of a reasonable market rate. "The invocation of a previously negotiated agreement as a guide to interim fees is based on the premise that both parties' uncoerced acquiescence in the terms of the contract reflects their conclusion that those terms are reasonable under then-current conditions." In the Matter of the Application of Home Box Office, Inc., Memorandum and Order, Civ. 13-95 (WCC) (S.D.N.Y. July 11, 1986) ("HBO") at 11.

Implicit in this premise is the notion that reasonable fees must be assessed with reference to current market conditions. Thus, in HBO, Magistrate Judge Dolinger rejected the proposition that the ASCAP rate court should "virtually automatically extend the terms of [the prior] agreement, notwithstanding any change in circumstances." HBO, slip op. at 7. Rather, the court noted that although a negotiated prior agreement between the parties may be "an appropriate starting point for an interim fee analysis," a "persuasive showing that the prior agreement would not be reasonable under current circumstances" must be taken into account. Id. at 8-9. It is, even at the interim fee stage, ASCAP's burden to show that the prior agreement was entered into "under comparable market conditions." In the Matter of the Application of Muzak Ltd. P'ship, No. 13-95 (WCC), 1992 U.S. Dist. LEXIS 8018, *6 (S.D.N.Y. June 10, 1992) (citation omitted). See generally In the Matter of the Application of Capital Cities/ABC, Inc. and CBS, Inc., 831 F. Supp. 137, 145 (S.D.N.Y. 1993) ("[W]e do not merely endorse as appropriate for

16

today the terms of compromises concluded yesterday.  Rather, [the Court] must faithfully address . . . changed circumstances that may make prior benchmarks outdated measures of fair value.").

In his interim fee determination in HBO, Judge Dolinger found that HBO had shown that "circumstances ha[d] altered substantially since the prior licensing agreement came into effect." Slip op. at 10.  Specifically, notwithstanding ASCAP's argument that the parties' 1983-1985 agreement should govern on the ground that the purpose of an interim fee award is "principally the maintenance of the *status quo*," HBO at 4, the court found that the earlier agreement had been negotiated when HBO's earnings were "substantial and rapidly increasing," having gone from $14 million in 1979 to $55 million in 1982 and $70 million in 1983, and that HBO had agreed to a flat sum of $13 million payable over three years "in reliance on the assumption that the growth trends of the prior years would continue." Id.  Contrary to that assumption, however, in 1984 and 1985 HBO's subscriber growth had slowed, revenue growth had dropped to 2%, and net income had declined from $70 million in 1983 to $45 million in 1985 and was expected to drop to $14 million in 1986.  Assessing the implication of these facts for the presumption that the *status quo* remained reasonable, the court stated:

> Where the relevant conditions have dramatically changed . . . this assumption is simply not valid, and in this case it is unlikely that HBO would willingly have entered into the 1983 license agreement if it had foreseen at that time the substantial impending reversal in its economic fortunes.

Id. at 11 (emphasis added).

The court concluded, accordingly, that ASCAP had "not adequately justified reliance upon the terms of its prior agreement with HBO, which was entered into

three years ago in economic circumstances that are materially different from those

confronting the parties today." HBO, slip op. at 23. Instead, the court used as the basis

for interim fees more recent benchmark agreements proffered by HBO which contained

fees nearly 50% lower on a per-subscriber basis than under the 1983 agreement.

In a subsequent proceeding in which ASCAP sought to rely on the same

1983-85 HBO agreement, Judge Dolinger pointed out that when HBO agreed to the flat

fees embodied in the agreement (as opposed to per-subscriber rates), it "was relying upon

certain projections of future subscriber growth" and that when these projections proved to

be "over-optimistic," it resulted in fees, expressed in per-subscriber terms, that HBO

might well not have agreed to pay. In the Matter of the Application of Showtime/The

Movie Channel, Inc., Civ. No. 13-95 (WCC), 1989 WL 222654, *7 (S.D.N.Y. Dec. 20,

1989) ("Showtime"). At the very least, the court concluded, ASCAP had failed to

establish the premise on which it justified its reliance on the HBO agreement – that it

represented a per-subscriber rate that HBO agreed to pay. 1989 WL 222654, at *8.

Where, as in HBO, an unanticipated change in circumstances would result

in maintaining a status quo that is no longer reasonable under current conditions, HBO,

slip op. at 11, it is appropriate that the Court modify the fee relationship between the

parties. In HBO, changed circumstances warranted an interim reduction in fees. In In the

Matter of the Application of American Broadcasting Companies, Inc., Civ. No. 13-95

(ELP), 1982 U.S. Dist. LEXIS 13411 (S.D.N.Y. May 26, 1982), the court ordered a

significant interim *increase* in the fees ABC Television Network was to pay ASCAP on a

showing that "serious" inflation, coinciding with a 93% increase in ABC's revenues in

the ten years since the parties had last agreed upon a license fee, warranted such an increase. Id. at *7-*10.

As in HBO, the 2004 ASCAP-RMLC agreement, covering the years 2001-2009 (2001-03 retroactively), was entered into in "economic circumstances . . . materially different from those confronting the parties today." HBO, slip op. at 23. At the time, the RMLC anticipated that revenue would increase by some 6% to 7% a year, such that the switch to flat fees pegged to that projected growth rate would not hurt the industry. Meehan Aff. ¶¶ 18, 20. Guided by this assumption, the RMLC persuaded ASCAP to move off of a percentage-of-revenue fee formula – which had been set at 1.615% of adjusted revenues under the parties' prior (1996-2000) agreement – and to accept instead total payments for 2001-2009 of $1,724,968,000, allocated as graduated annual fixed payments. Meehan Aff. ¶ 19. Straightforward math reflects that the total fees agreed to were in line with industry growth projections.

As described above, however, those projections proved to be far off the mark. Industry revenues, flat from 2004 through 2006, dropped slightly in 2007 and then plunged by over 10% in 2008 and by an estimated more than 17% in 2009 – opening a gap of nearly $300 million between what the industry actually paid under the license and what it would have paid had the rate of 1.615% of revenue implicit in the 2004 agreement instead controlled fee setting. See Bigelow Decl. ¶ 42. To be sure, the industry cannot reclaim any portion of the monies already paid under the prior license. It must live with the consequences of what proved to be a bad deal. The issue presented here is a different one, however. It is the propriety of continuing fees at a level that has proven to be a windfall to ASCAP and that ASCAP cannot justify under current economic conditions.

19

The unprecedented recent downturn has necessitated drastic belt-tightening measures in the radio industry. Plummeting advertising revenues have forced radio stations across the country to implement deep cost cutting – including layoffs, salary reductions, and cessation of marketing and advertising efforts – to stay afloat. Christian Decl. ¶¶ 9-10; Cummings Aff. ¶¶ 10-13. Total employment in the radio industry declined by some 12% from 2007 to 2009. Bigelow Decl. ¶ 34. The cuts have affected even the largest radio groups. Clear Channel Radio, the country's largest radio group, cut 12% of its workforce in 2009, including the entire corporate marketing department and local on-air personalities, production directors, and producers at several stations. Bigelow Decl. ¶ 31.

Major radio groups fell, or nearly fell, into bankruptcy. The third largest radio group in the country, Citadel, filed for bankruptcy on December 20, 2009 (following its delisting from the New York Stock Exchange), and Clear Channel narrowly averted the same fate by selling $2.5 billion in bonds in mid December 2009. Bigelow Decl. ¶¶ 30-31.

Profits are down across the industry and are expected to rebound quite slowly over the next several years. Bigelow Decl. ¶ 26; Christian Decl. ¶ 11; Cummings Aff. ¶ 17. Revenues from digital media platforms, which ASCAP is likely to tout as potentially game-changing, are growing slowly but are not projected to comprise more than a low single-digit percentage of industry revenues in the foreseeable future. Bigelow Decl. ¶ 35; Christian Decl. ¶ 12; Cummings Aff. ¶ 14. Indeed, stations such as those in the Emmis group are actually losing money on Internet streaming at present, given the significant associated costs. Cummings Aff. ¶ 14. Especially given that

stations have failed to see a correlation between Internet or wireless streaming and audience growth, as the radio industry is primarily local in nature, benefits from "new media" applications have not yet materialized in a significant way.  Christian Decl. ¶ 12; Cummings Aff. ¶ 14.

## APPLICANTS' PROPOSED INTERIM FEE

Applicants are entitled to a significant interim fee reduction.  What we understand to be ASCAP's proposal – simply maintaining the payments called for in the final year of the 2004 agreement  – would as an initial matter disregard the parties' express understanding that the fees allocated to any particular year were not intended to represent reasonable fees for those years.  See Meehan Aff. ¶ 20 and Ex. 5, Ex. A at ¶ 7. It is of course to ASCAP's advantage to seek to perpetuate fees at the *highest* level of those stipulated to for the entire term of the 2004 agreement, but at a bare minimum, this interpretation of the *status quo* is inappropriate here.

More fundamentally, maintenance of the *status quo* even correctly computed is not warranted for the reasons discussed in this submission.  As explained by Dr. Bigelow, Applicants believe instead that an industry-wide fee of $10,801,932 per month ($129.6 million on an annualized basis) is an appropriate interim fee.[14]  This figure is calculated by applying the fee-to-revenue relationship implicit in the 2004 agreement to an estimate of the industry's actual – as opposed to earlier projected – revenues

---

[14] Total annual interim fees can be allocated to both blanket and per-program stations based on each station's pro-rata share of December 2009 industry-wide fees.

according to Kagan and adding 5%[15] to account for "new media" uses covered by the Application but not by the 2004 license.  See Bigelow Decl. ¶¶ 42, 45.  The selection of 1.615% serves to restore payments to the levels anticipated to be generated over the course of the prior license, as opposed to the more than 21% higher fees that actually were generated over the license term and the more than 89% higher fees that ASCAP's preferred carry-forward of the 2009 fees would yield.

Concerning "new media" fees, as discussed, the impact of ongoing experimental explorations of such new platforms on the economic performance of the radio industry is, and for the foreseeable future is projected to be, minimal.  Affording ASCAP a fee premium of 5% on top of the fees generated by a restoration of the 1.615% measure – or some $6.2 million annualized – should more than reasonably compensate ASCAP's members for these uses of their music.

---

[15] The 5% is merely an estimate and is not intended to have any evidentiary value for the final fee proceeding, in which the value of "new media" uses will be fully litigated.

## **CONCLUSION**

For the foregoing reasons, Applicants respectfully request that the Court

grant the proposed interim fee set forth above.

New York, New York
February 26, 2010

R. Bruce Rich (RR 0313)
Jonathan Bloom (JB 7966)
Heather R. Solow (HRS 8680)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Attorneys for the Radio Music License*
*Committee and The Cromwell Group,*
*Inc. and Affiliates, et al.*

23

## CERTIFICATE OF SERVICE

I, Heather R. Solow, hereby certify that on February 26, 2010, I caused a copy of the foregoing Memorandum of Law of Cromwell Group, Inc. and Affiliates, et al. in Support of Application for Interim Fee Determination to be served by email and first class mail on:

Jay Cohen
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Heather R. Solow