UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application for the
Determination of Interim License Fees for

THE CROMWELL GROUP, INC. AND
AFFILIATES, et al.

No. 10 CV 167 (DLC) (MHD)

Related to

UNITED STATES OF AMERICA

          Plaintiff,

       v.

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS,

          Defendant.

No. 41 CV 1395 (DLC) (MHD)

**ASCAP'S MEMORANDUM OF LAW**
**CONCERNING INTERIM FEES**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ........................................................................................ 3

The Parties .............................................................................................. 3

The 2004 ASCAP-RMLC License ......................................................... 6

The RMLC's Requested License ............................................................ 8

The Radio Industry Of 2010 ................................................................... 8

    Traditional Broadcasting And Simulcasting .......................................... 10

    New Online Uses ................................................................................... 11

    New Mobile Uses .................................................................................. 13

    HD Radio .............................................................................................. 13

ARGUMENT ........................................................................................... 14

A.    Existing License Fees Are Presumptively Appropriate Interim License Fees Under AFJ2 ................................................................. 15

B.    There Are No Changed Circumstances Sufficient To Rebut The AFJ2 Presumption ................................................................. 17

C.    All Of These Issues Will Be The Subject Of Extensive Discovery In The Final Fee Proceedings ................................................................. 19

CONCLUSION ........................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*In re AOL,*
    559 F. Supp. 2d 332 (S.D.N.Y. 2008) (also cited as 562 F. Supp. 2d 413
    (S.D.N.Y. 2008)) ..................................................................................................... 12, 18

*In re Buffalo Broad. Co., Inc.,*
    No. 41-1395 (S.D.N.Y. June 17, 1985) (order setting interim fees) .................. 15, 16, 19

*In re Buffalo Broad. Co., Inc.,*
    No. 41-1395 (S.D.N.Y. Feb. 17, 1987) (order setting interim fees) ........................... 1, 14

*In re Hicks Broad. of Ind., LLC,*
    No. 41-1395 (S.D.N.Y. Oct. 15, 2004) (order setting final fees) ...................................... 7

*In re Muzak Ltd. P'ship,*
    No. 41-1395, 1992 WL 142749 (S.D.N.Y. June 10, 1992) ......................... 14, 15, 16, 17

*In re Nat'l Cable Television Ass'n,*
    No. 41-1395, 1999 WL 335376 (S.D.N.Y. May 26, 1999) ........................................... 14

*In re Youtube, LLC,*
    616 F. Supp. 2d 447 (S.D.N.Y. 2009) ............................................................... 3, 14, 20

*United States* v. *Am. Soc'y of Composers, Authors & Publishers,*
    No. 41-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001) ................................... *passim*

The American Society of Composers, Authors and Publishers ("ASCAP") submits this Memorandum of Law Concerning Interim Fees, pursuant to Section IX(F) of the Second Amended Final Judgment dated June 11, 2001 ("AFJ2"), and this Court's Order dated February 18, 2010, for the fixing of interim fees for the public performance of musical works in the ASCAP repertory by the local broadcast radio stations represented by the Radio Music License Committee (the "RMLC") in this proceeding (collectively, the "RMLC Stations").

## PRELIMINARY STATEMENT

This motion seeks to ensure a steady stream of radio public performance royalties to the writers and publishers of musical works — who depend heavily on that income to continue their creative endeavors — pending this Court's determination of final fees payable by the RMLC to ASCAP for the period January 1, 2010 forward.

AFJ2 grants ASCAP the right to interim fees "to preserve the *status quo*" during rate court proceedings. *See In re Buffalo Broad. Co., Inc.*, No. 41-1395, at 8 (S.D.N.Y. Feb. 17, 1987) (order setting interim fees) ("*Buffalo Broadcasting II*") (emphasis in original). To achieve this goal, AFJ2 further establishes a presumption that fees set by existing licenses are reasonable for subsequent interim periods. AFJ2, § IX(F), *United States* v. *Am. Soc'y of Composers, Authors & Publishers*, No. 41-1395, 2001 WL 1589999, at *7 (S.D.N.Y. June 11, 2001). Only changed circumstances of sufficient magnitude will overcome the presumption.

There is no basis here to disturb AFJ2's presumption that the fees paid in 2009, pursuant to the terms of the ASCAP 2004 Radio Station License Agreement (the

"2004 License") (attached as Exhibit A to the Declaration of Jay Cohen)[1] as supplemented, are reasonable as interim fees for periods commencing January 1, 2010. The 2004 License — a freely-negotiated agreement between sophisticated parties — was lauded by both sides as an effective, fair agreement reflecting the value of the ASCAP license.  ASCAP and the RMLC were no strangers when they negotiated the 2004 License.   It is the most recent in a long history of licenses between the parties, both of whom are well-versed in valuing the public performance license.   Thus, the AFJ2 presumption is entitled to even greater weight here.

Nevertheless, the RMLC will seek a reduction in interim fees based solely on a recent decline in revenue across the radio industry.  But the industry's recent decline in revenue — a decline from which the radio stations have already begun to recover, according to their own reports — tells only part of the story, and ignores the many reasons why, in fact, radio public performance fees should be increased at the conclusion of the final fee proceeding and should not be reduced on an interim basis.

Most importantly, the radio industry — seeking a license far broader in scope than the 2004 License — today uses more music, in the aggregate, than it did in 2004, and in more ways than it did when the parties entered into the 2004 License.  The RMLC Stations continue to use a significant amount of music per hour in the traditional broadcasts and online simulcasts covered by the 2004 License.  The RMLC Stations also make extensive use of public performances of ASCAP music through their recent and ever-expanding interactive online and mobile music initiatives — all of which are beyond the scope of the 2004 License but are within the scope of the license the RMLC now

---

[1]    Exhibits to the Declaration of Jay Cohen hereinafter are referred to as "Ex."

seeks, thereby warranting an additional increase in the value of the ASCAP public performance license.

And, notwithstanding a recent revenue decline — due largely to the economic recession that has widely affected the nation's economy — projections for the radio industry predict revenue growth over the next license term.   Moreover, the vast majority of radio stations remain profitable at healthy margins.  In fact, the radio industry is one of the most profitable segments of the entire media and entertainment industry.

In any event, these complicated issues will be before the Court on ASCAP's application for the determination of final fees and will be the subject of extensive discovery between the parties.   To engage in that exercise now would be duplicative, time-intensive, and ultimately at odds with AFJ2's intent that interim fees be determined promptly — with no or little discovery — as "a rough, tentative and temporary determination, subject to retroactive adjustment when the final fee is determined . . . ."  *In re Youtube, LLC*, 616 F. Supp. 2d 447, 450-51 (S.D.N.Y. 2009) (citation omitted).

Accordingly, ASCAP respectfully requests that the Court fix interim fees for 2010 in a sum total of no less than $232,175,000, the amount paid by the RMLC Stations in 2009.[2]

## BACKGROUND

### *The Parties*

Established in 1914, ASCAP is a membership association of over 370,000 songwriters, composers and lyricists ("writers") and music publishers — the owners of

---

[2]    This amount is the sum of the 2009 payment of $231,425,000 under the 2004 License and an additional $750,000 payment in 2009 for multicasting.

the copyrights in musical works. (*See* www.ascap.org.) ASCAP, the largest performing rights organization in the United States, licenses the non-dramatic public performances of its members' musical works to numerous users, including television networks, cable networks, local broadcast television stations, local broadcast radio stations, bars, and restaurants, among many other businesses. (*Id.*)

Writers are the authors of the musical works that are the foundation of the music industry and those in whom the musical work copyright initially vests. Music publishers, to whom a songwriter frequently assigns his or her copyright in exchange for a share of the income from the work's exploitation, help writers create and exploit their works by, among other activities, assisting them in their creative process and promoting and licensing their works.

Today, ASCAP's repertory contains many millions of copyrighted musical works. (*Id.*) ASCAP is the only U.S. performing rights organization created and controlled by writers and publishers with a Board of Directors elected by and from the membership. (*Id.*) It is an unincorporated association, distributing to its members as royalties all sums collected for the public performance of its members' musical works, less expenses and reasonable reserves. (*See* Declaration of Pavlos Mourdoukoutas at ¶ 1.) ("Mourdoukoutas Dec.") ASCAP's members are writers and publishers of every kind of music — from pop, rock, alternative, country, and R&B to jazz, gospel, Christian, dance, opera, and classical — and include some of the greatest names in American music, past and present — from George Gershwin and Stevie Wonder to Leonard Bernstein and Marc Anthony. (*See* www.ascap.com.) Although many ASCAP members enjoy illustrious careers, the vast majority are not famous, do not win awards, and earn only

4

modest royalties as writers.  For many writers and publishers, the performance royalties received from ASCAP are their largest single source of income from the exploitation of their copyrights.

ASCAP protects and advances the rights of its members by granting licenses, on a blanket basis, to any licensee that publicly performs music.  (*Id.*)  Millions of public performances of copyrighted music occur each day in the United States.  Given the vast number of music users and performances, it would be extremely time-consuming and costly for ASCAP's members to locate each music user and license these performances by themselves.  (*Id.*)  Instead, ASCAP's members grant ASCAP the non-exclusive authority to license the non-dramatic performance rights in their copyrighted musical works.  (*Id.*)  Likewise, without ASCAP (and other performing rights organizations), users of copyrighted music like the RMLC Stations would face an equally daunting task in trying to license individual musical works efficiently.  In addition to licensing its members' works, ASCAP plays a critical role in distributing royalties to its members for the performances made pursuant to such licenses.  ASCAP also helps its members by arranging workshops and showcases, and by engaging in promotional efforts through its web sites and publications.  (*Id.*)

The RMLC represents the collective interests of the overwhelming bulk of the commercial radio industry in the United States, with the exception of nearly 400 radio stations represented by the National Religious Broadcasters Music License Committee, which previously negotiated separate agreements with ASCAP.  To that end, the RMLC negotiates and/or litigates license fees for the public performance of music by local commercial broadcast radio stations throughout the country.  Historically, most U.S.

commercial radio stations have either expressly authorized the RMLC to negotiate and/or litigate with ASCAP on their behalf or have agreed to be bound by the outcome of the ASCAP/RMLC negotiations or court proceedings. As a result, following the conclusion of rate-setting proceedings between the RMLC and ASCAP, thousands of radio stations have entered into license agreements with ASCAP based on the outcome of such proceedings.

### The 2004 ASCAP-RMLC License

The 2004 License grants all licensee radio stations a non-exclusive license to perform publicly ASCAP musical works by "radio broadcasting" and by "simulcasting." The 2004 License defines "radio broadcasting" as "over-the-air" broadcasting, including the simultaneous transmission of an FCC-licensed digital broadcast signal with identical content. "Simulcasting" is defined as the simultaneous stream of over-the-air broadcast transmissions over the Internet without any alteration other than advertising, and is limited to "streaming over the Internet *only* where such transmission is accessed from a page on the Radio Station Web Site and received by means of a personal computer or other device capable of receiving such transmissions." The 2004 License expressly excludes the streaming of musical works accessed from third-party web sites or uses of musical works on radio station web sites other than as part of the radio station broadcast signal itself, providing, instead, that "[s]uch other uses shall be subject to appropriate separate licensing."[3]

---

[3]   Due to these limitations, only those simulcasts available on a web site associated with the call letters of an FCC-licensed radio station are covered by the 2004 License. The 2004 License does not extend to simulcasts accessible through a radio station's corporate web site or through partnered web sites.

Under the 2004 License, the fees payable to ASCAP totaled $1,724,968,000 for the full term of the license, payable in specified annual amounts. The amount specified for 2009 was $231,425,000.[4]  In approving the agreement, the Court expressly endorsed the 2004 License fees as "reasonable and non-discriminatory for the license period." *See In re Hicks Broad. of Ind., LLC*, No. 41-1395, at ¶ 1 (S.D.N.Y. Oct. 15, 2004) (order setting final fees).  (Attached as Ex. B.)  Each licensed radio station's share of the annual license payment is determined in accordance with the provisions of a license fee allocation formula developed by the RMLC and approved by the Court.

In November 2008, ASCAP and the RMLC entered into a supplemental license for the public performance of ASCAP music through secondary program transmissions over FCC-assigned digital frequencies maintained by the radio stations covered by the 2004 License, a form of broadcasting known as multicasting.[5]  Digital Radio Broadcasting Agreement between ASCAP and the Radio Music License

---

[4]  The 2004 License agreement states that "[b]y agreeing to an Industry-wide Fee for the period 2001-2009, the parties have expressly not agreed that the Annual License Payment set forth herein comprises reasonable license fees for a particular year but instead reflect arbitrary yearly allocations for the convenience of both the Licensees and ASCAP. . . . The allocation of fees to any particular calendar year shall not be considered in connection with the determination of final fees for any subsequent period for local commercial radio stations . . . ."  September 2004 Letter Agreement (incorporated in the 2004 License).  ASCAP nonetheless believes that discovery will show that the increasing fees paid under the 2004 License were appropriate in light of the evolution of the radio industry and the increasing use of ASCAP music over the term of the license, as described more fully herein.

[5]  Multicasting is most frequently used by those radio stations which have converted to HD (hyper digital) Radio.   HD Radio, an FCC-approved digital audio broadcasting method that delivers CD-quality digital audio on the FM band, relies on digital radio signals that can be subdivided to send out two or more different kinds of programming simultaneously.  When a station does this, it is multicasting.

Committee (Nov. 19, 2008).  (Attached as Ex. C.)  For that right, ASCAP received an additional $750,000 license fee in 2009.

### The RMLC's Requested License

On December 11, 2009, the RMLC requested a "through-to-the-listener" license from ASCAP to cover performances of ASCAP-repertory music in "(i) the Stations' (including any translators') transmissions to users for which an ASCAP license is required, *however and whenever distributed*, including, without limitation all broadcast transmissions, digital transmissions, high-definition transmissions, and transmissions over Internet and wireless platforms or *via any other platform* capable of displaying or disseminating a Stations' transmissions or (ii), as applicable, the Station owners' radio division online or wireless transmissions."   Letter from RMLC to ASCAP (Dec. 11, 2009) (emphasis added).  (Attached as Ex. D.)  The precise scope of the RMLC's vague and open-ended request is not apparent from the face of the application and may, in fact, exceed what the RMLC may permissibly request under AFJ2; what is clear is that the RMLC application drastically expands the scope of its requested license beyond that of any prior ASCAP-RMLC license.

### The Radio Industry Of 2010

Although the radio industry, like many industries across the United States, experienced a recent decline in revenues, the industry today is financially sound and — capitalizing on new media initiatives and new revenue streams — poised to grow.  (*See* Declaration of Robin Flynn at ¶ 6.) ("Flynn Dec.")  Public projections forecast that radio station revenues will steadily increase over the next license period.  (*Id.* at ¶¶ 6, 27.)  In addition, revenues from online and mobile uses of music are projected to grow at a pace

of 12 to 20% during the same period. (*Id.* at ¶ 29.) Most importantly, radio remains one of the most profitable segments of the media and entertainment industry. (*Id.* at ¶ 25.)

The radio stations themselves paint a promising picture of both their near- and long-term futures. As the Chairman of the RMLC and President and CEO of Saga Communications explained in a letter to shareholders accompanying Saga's 2008 Annual Report, "broadcasting, as an industry, will regain momentum and prosper. In truth, radio listening is up in America and, even though industry revenue is down, we are not endangered as are many newspapers. We could well even be strengthened by this change of landscape in the media business." Cover Letter to Saga Communications, Inc., Annual Report for year ending December 31, 2008, retrieved from http://www.saga communications.com/corporate/letter_from_the_president.shtml on February 25, 2010. (Attached as Ex. E.) More recently, David Field, the President and Chief Executive Officer of Entercom Communications, announced that:

> Entercom posted strong sequential improvement during the fourth quarter, ending the year with positive revenue and operating cash flow growth for the month of December. Business conditions improved significantly during the fourth quarter and this positive trend has accelerated into the first two months of 2010. Furthermore, despite the terribly challenging conditions of 2009, we have fulfilled our stated goal of emerging from the recession with enhanced capabilities, a stronger competitive position and an improved business model. . . . The outlook for 2010 has brightened, bolstered by accelerating advertiser demand and improvement in radio's relative value proposition in comparison to other media and we believe we are well positioned to capitalize on this rebound.

Press Release, Entercom Communications Corp., Entercom Communications Corp. Reports Fourth Quarter and 2009 Annual Results (Feb. 23, 2010), at 1. (Flynn Dec. at Ex. VV.)

Beyond fortifying the radio industry for the future, the changed landscape of the media business has also brought about a significant expansion in the use of ASCAP music by the RMLC Stations.  Today, radio stations use music in a number of ways.  Among other uses, radio stations engage in: (a) traditional broadcasting and simulcasting; (b) new online uses; (c) new mobile uses; and (d) HD Radio.

### Traditional Broadcasting And Simulcasting

First, radio stations continue their traditional broadcasts and simulcasts, but to a greater degree.  On an industry-wide basis, traditional broadcasts now reach more than 236 million unique listeners each week, according to radio network audience reports released by Arbitron, an increase from 228 million unique listeners each week as of September 2004.[6]  (Flynn Dec. at ¶ 8.)  Comparing Fall 2004 and Spring 2009, and excluding those radio stations represented by the National Religious Broadcasters Music License Committee, the number of primary music stations increased 2% from 8,234 to 8,418.  Counting HD and multicasting AM/FM stations, however, the number of music stations is up 24% in 2009 to 10,244.  (*Id*.)

In addition, RMLC stations, which use a significant amount of music per hour, continue to be music intensive.  (Mourdoukoutas Dec. at ¶¶ 12-13 .)  Preliminary ASCAP analyses show that RMLC Stations across all formats perform, on average, approximately 10-11 songs per hour.  (*Id*. at ¶ 12.)  For example, RMLC Pop music stations played 11.39 songs per hour in 2009.  (*Id*. at ¶ 13.)  Similarly, RMLC Country

---

[6]    Arbitron is a media and marketing research firm that collects data on radio listenership.  It provides that data to radio broadcasters, advertisers, advertising agencies and other media companies.  *See* www.arbitron.com.

stations played 12.35 songs per hour in 2009.  (*Id.* at ¶ 13.)  Finally, RMLC Jazz stations played 11.04 songs per hour in 2009.  (*Id.* at ¶ 13.)

        Moreover, there has been a dramatic growth in web-based simulcasting since the execution of the 2004 License.  Overall, from 2004 to 2009, the total number of radio stations (the majority of which are commercial stations) simulcasting their broadcast content is estimated to have increased by as many as three times.  (Flynn Dec. at ¶ 10.)  Recent industry reports show that, as of fall 2009, roughly 6,206 radio stations (the majority of which are, again, commercial stations) were simulcasting their AM/FM broadcasts online, with an additional 249 HD Radio multicast stations streaming their content online.  (*Id.*)

### *New Online Uses*

        The RMLC Stations have broadened their online streaming efforts beyond simply simulcasting their over-the-air programming.  (*Id.* at ¶ 14.)  Today, many radio stations have revamped their web sites to offer users numerous new and interactive ways to listen to music.  (*Id.* at ¶¶ 14-15.)  Radio station web sites now offer on-demand access to songs, live music performances, music videos, selective playlists, and individual segments of traditional broadcasts, among other things.  (*Id.* at ¶ 14.)  In addition, major broadcasters have also launched independent music portal web sites, which aggregate simulcast as well as non-simulcast music content.  Clear Channel Communications' ("Clear Channel") iHeartRadio music portal, for example, offers non-simulcast digital streaming channels, on-demand audio and video programming, and music-driven social media features like on-air talent blogs and photos (in addition to simulcasting 350

AM/FM broadcasts). (*Id.* at ¶ 15; *see also* www.iheartradio.com).[7] (Screenshot attached as Ex. F.) Beyond increasing the absolute amount of music content available to listeners, these features allow for greater interactivity, portability and customizability — characteristics that render the music content itself more valuable to both music users and their consumers, as the ASCAP rate court has previously noted. *In re AOL*, 559 F. Supp. 2d 332, 400-02 (S.D.N.Y. 2008) (also cited as 562 F. Supp. 2d 413, 482-84 (S.D.N.Y. 2008)).

The online efforts of local broadcast radio stations are a success, both in terms of increased listenership and revenue expansion. In 2004, online radio reached only approximately 19 million listeners per week. (Flynn Dec. at ¶ 11.) By 2009, that figure had more than doubled to 42 million listeners per week. Moreover, online radio listening appears to be driving music consumption up overall, instead of eroding the traditional radio audience. According to Clear Channel, "[d]igital streaming now augments AM/FM listener levels by up to 16%." (*Id.*)

Further, online radio revenues, including revenues generated through simulcasting, offer a consistent bright spot in the financial picture of the radio industry. In 2004, Internet radio revenues were only approximately $59 million, or 0.3% of traditional radio revenues. (*Id.* at ¶ 29.) Projections forecast that Internet revenues will reach $827 million by 2013. (*Id.*)

---

[7]    Corporate web sites like the iHeartRadio portal are not covered by the 2004 License. In accordance with the limitations in the 2004 License, Clear Channel applied to ASCAP, and ASCAP in turn applied to this Court, for a determination of reasonable license fees for public performances made through its stations via non-simulcast Internet and wireless transmissions. Clear Channel negotiated a settlement with ASCAP before trial, and, in March 2009, entered into a license agreement with ASCAP for such uses that also expired on December 31, 2009.

### New Mobile Uses

In addition to increased and varied Internet distribution of music, many radio stations have also launched interactive radio applications for mobile phones. In 2006, Clear Channel, for example, first announced plans to stream local radio stations onto mobile phones. (*Id*. at ¶ 18.) In 2008, major broadcasters moved beyond basic mobile phones and into the smartphone market. Entercom Communications joined with mobile application provider FlyTunes to launch, in January 2008, the first content network specifically designed to deliver interactive radio, video, and podcasts to smartphones such as the Apple iPhone. (*Id*. at ¶ 20.) Other broadcasters, including Clear Channel, the Beasley Broadcast Group, Entravision Communications, Regent Communications, Emmis Communications, and Citadel Broadcasting have all also announced or launched similar iPhone initiatives. (*Id*. at ¶ 20.)

These mobile initiatives have met with rapid success. Clear Channel's iHeartRadio application, for example, launched for the iPhone on October 9, 2008 and was subsequently made available for use on Blackberry handsets and Android devices. (*Id*. at ¶ 20.) As of January 25, 2010, iHeartRadio is a top 100 iPhone application and a top 20 BlackBerry application, with more than 4.8 million total unique downloads. (*Id*. at ¶ 22.) The launch of "cell phone radio" is a major milestone in modern radio history, offering listeners the benefits of interactive, music-intensive services in a smaller, portable package.

### HD Radio

Finally, radio stations have increased their HD Radio offerings. Because the digital audio signals used in HD Radio broadcasts can be subdivided, radio stations

broadcasting in HD have the ability to transmit additional audio content simultaneously on a second or third HD channel. At the end of 2004, only 225 radio stations had converted to HD Radio. (*Id.* at ¶ 24.) As of December 2009, there were 1,966 HD Radio stations in 238 markets, plus 1,139 HD2/HD3 multicast FM stations. (*Id.*) HD Radio stations now reach 85% of the U.S. population and 50% of all radio listeners. (*Id.*)

*          *          *

In sum, there has been an increase in aggregate ASCAP music use across the already music-intensive radio industry since 2004 — uses that will continue to expand over the next rate term.

**ARGUMENT**

Interim fees are intended to "preserve the status quo or otherwise avoid harm to ASCAP by ensuring that it has a continuing source of payments for the use of its copyrighted music." *Buffalo Broadcasting II* at 8; *see also In re Nat'l Cable Television Ass'n*, No. 41-1395, 1999 WL 335376, at *3 (S.D.N.Y. May 26, 1999) (same). Moreover, pursuant to AFJ2, interim fees — "a rough, tentative and temporary determination, subject to retroactive adjustment" — must be determined quickly. *In re Youtube, LLC*, 616 F. Supp. 2d at 450-51 (citation omitted); AFJ2, § IX(F), 2001 WL 1589999, at *7 ("The Court shall then fix an interim fee within ninety (90) days of such application for an interim fee retroactive to the date of the written request for a license . . . ."). To these ends, AFJ2 establishes a presumption that fees set by existing licenses are reasonable for subsequent interim periods. AFJ2, § IX(F), 2001 WL 1589999, at *7. Only "changed circumstances of sufficient magnitude" will overcome the presumption. *In re Muzak Ltd. P'ship*, No. 41-1395, 1992 WL 142749, at *4 (S.D.N.Y. June 10, 1992) ("*Muzak*").

14

AFJ2's presumption — that the 2009 fees paid under the 2004 License are appropriate interim fees — should apply here. The radio industry of today makes far greater use of ASCAP music than it did at the time of the negotiation of the 2004 License. And, notwithstanding a recent decline in revenue across the radio industry, the radio industry forecasts revenue growth — and continued profitability — over the next license term. (Flynn Dec. at ¶¶ 27-29.) In any event, all of these issues will be the subject of extensive discovery in connection with ASCAP's final fee application, and there is no reason to put the parties to that task on this motion for interim fees.

## A.    Existing License Fees Are Presumptively Appropriate Interim License Fees Under AFJ2

AFJ2 provides that "[i]n fixing [an] interim fee, there shall be a presumption that the last existing license (if any) between the music user and ASCAP, or between licensees similarly situated to the music user and ASCAP, sets forth the appropriate interim fee." AFJ2, § IX(F), 2001 WL 1589999, at *7. Thus, the Court may presume that existing fees are reasonable unless the music user can demonstrate "that the prior agreements do not represent reasonable compensation for the requested license" because of significant changed circumstances. *In re Buffalo Broad. Co., Inc.*, No. 41-1395, at 43 (S.D.N.Y. June 17, 1985) (order setting interim fees) ("*Buffalo Broadcasting I*") (local television station applicants unable to demonstrate changed circumstances sufficient to rebut the presumption of reasonableness of "prior, voluntary agreements"); *Muzak*, 1992 WL 142749 at *4 (music service provider applicants unable to demonstrate changes to the industry of sufficient magnitude to offset the presumption of reasonableness attached to the previous agreements).

Here, there is no question that the 2004 License is the "last existing license" between ASCAP and the RMLC and that it was freely negotiated between the parties, reflecting their mutual determination of the reasonable value of the public performance license. As the RMLC announced upon its execution, the agreement "represent[s] a significant step forward for the industry and a real achievement for the Radio Music License Committee and the stations, whose interests we represent." Press Release, Radio Music License Committee, ASCAP Status (undated). (Attached as Ex. G.) Similarly, ASCAP praised the "effective negotiation" that "resulted in an agreement which can only serve to strengthen the longstanding partnership between America's leading creators of music and their most valuable customers." Press Release, American Society of Composers, Authors and Publishers, ASCAP and the Radio Industry Announce the Largest Single Licensing Deal in Radio History (Oct. 18, 2004). (Attached as Ex. H.)

The 2004 License was not the first entered into by the parties, but the most recent following decades of negotiating such licenses. As such, the 2004 License fee presumption carries even greater weight here. *Muzak*, 1992 WL 142749, at *5 n.3 (observing that "there is a lengthy history of negotiations and agreements between the parties that cannot be easily ignored in setting the interim fee. Thus, the presumption accorded to the previous license agreement is elevated in the instant proceeding.").

This Court repeatedly has applied the presumption in fixing interim license fees. *See Buffalo Broadcasting I* at 42; *Muzak*, 1992 WL 142749, at *5. For example, in *Muzak*, background music service provider applicants sought a significant reduction in license fees, arguing that changes in the nature and economic circumstances

of the music service industry and increased competition from third parties made the previous licensing agreement an inappropriate basis upon which to base interim fees. *Muzak*, 1992 WL 142749, at *3. The Court rejected these arguments, finding that there had "not been changed circumstances of sufficient magnitude to offset the presumption that the previous licensing agreement is reasonable." *Id.* at *4 (financial information about revenues and capital expenditures provided by the applicants was deemed "too limited and too ambiguous to justify any reduction in interim fees").

As set forth below, the same is true here.

**B.     There Are No Changed Circumstances<br>     Sufficient To Rebut The AFJ2 Presumption**

The radio industry's revenue contraction — due largely to the economic recession that has affected all industries — is only one element of a complex industry's economy. The full industry picture easily supports fixing interim fees in the same amount as that paid by the RMLC Stations in 2009.

As an initial and crucial matter, the RMLC Stations today use ASCAP music in more ways than ever before. As discussed above, the 2004 License covered traditional over-the-air broadcasts and simultaneous online transmissions from radio stations' web sites. Both of those uses have increased significantly over the license period in terms of aggregate music use, due to more terrestrial stations and simulcasts. Moreover, such uses continue to be music intensive, due to the high number of songs per hour played on RMLC Stations.

Beyond simply expanding music use in their offerings covered by the 2004 License, the RMLC Stations now seek to license numerous additional online and mobile initiatives, which are not within the scope of the 2004 License, and involve even

greater and more valuable uses of ASCAP music. *See In re AOL*, 559 F. Supp. 2d 332, 400-02 (S.D.N.Y. 2008) (also cited as 562 F. Supp. 2d 413, 482-84 (S.D.N.Y. 2008)) (finding that the unique features of the Internet and the ability of users to access music on an on-demand basis enhance the value of that music and justify an increased royalty rate). Today, many radio stations have web sites that include interactive on-demand access to songs, live music performances, music videos, and selective playlists. (Flynn Dec. at ¶¶ 14-16.)    In addition, many radio stations have moved into the mobile market via offerings for mobile phones and smartphones. (*Id*. at ¶¶ 18-21.)  Finally, HD Radio has expanded significantly over the last five years and continues to reach new audiences. (*Id*. at ¶¶ 23-24.)  In sum, there has been a substantial increase in aggregate music use across the already music-intensive industry since the negotiation of the 2004 License — warranting an increase in the value of the ASCAP public performance license to the RMLC Stations over the next rate term.

Moreover, even with a recent revenue decline, radio remains one of the most profitable segments of the media and entertainment industry. (*Id*. at ¶ 25.)  Radio's EBITDA (earnings before interest, taxes, depreciation and amortization) as a percent of revenue was a healthy 32.4% in 2008, second only to that of cable. (*Id*.)   Both industry analysts and broadcasters alike project sustained future revenue growth over the next five years and double-digit growth for online and mobile revenues. (*Id*. at ¶¶ 27-29.)

Indeed, radio stations have already begun to rebound from the recent downturn.  According to Katz Media Group, "national spot radio sales will probably be up 19% in the first quarter of 2010 compared to the same period in 2009, with Katz's consolidated radio revenues up 26% in January, and pacing up 11% in February and 13%

in March."  Erik Sass, *Radio Revenues Fell 18% in 2009*, MediaPost News, Feb. 19,

2010.  (Flynn Dec. at Exhibit XX.)  Similarly, Les Moonves, the President and Chief

Executive Officer of CBS, announced that "[r]adio is also a really strong story.  As we

promised you late last year, and to some skepticism from many, radio will be showing

plus signs in the first quarter.  Average pacing has been rising in 2010 and is well ahead

of last year."  Transcript, CBS Corp., Q4 2009 Earnings Conference Call (Feb. 18, 2010),

at 5 (Flynn Dec. at Exhibit WW.)

C.    **All Of These Issues Will Be The Subject Of**
       **Extensive Discovery In The Final Fee Proceedings**

All of the above issues will be the subject of extensive litigation and

discovery between the parties in connection with ASCAP's final fee application.  To

engage in that discovery and litigation now with respect to interim fees would be time-

consuming, expensive and duplicative of the final fee proceedings and would be in

conflict with AFJ2's intent.

Under AFJ2, interim license fees are to be set on the basis of no or limited

discovery and within 90 days.  AFJ2, § IX(F), 2001 WL 1589999, at *7 ("The Court shall

then fix the fee within ninety (90) days . . . allowing only such limited discovery, if any,

that the Court deems necessary to the fixing of such interim fee.").  It is simply not

feasible for the Court to engage in a proper evaluation of the merits of the parties'

respective positions on the basis of limited discovery.  And developing a more

comprehensive record on the various complicated issues presented in this proceeding

would likely take much longer than the short time period allotted for interim fee

determinations.  *Buffalo Broadcasting I*, at 42 ("[T]he function of the interim fee is to

ensure that ASCAP need not wait until the completion of fee negotiations or a rate proceeding in order to be compensated for the licensee's use of its music.").

Finally, there is no need to engage in this exercise now.  Interim fees are not intended to be precise.  *In re Youtube, LLC*, 616 F. Supp. 2d at 450-51 ("An interim fee is to be set promptly, as a rough, tentative and temporary determination, subject to retroactive adjustment when the final fee is determined, and may bear little resemblance to the final fee.") (internal quotation marks omitted).  For that reason and to allow for a quick and "rough" determination that ensures that income continues to flow to ASCAP members, AFJ2 expressly provides for a retroactive adjustment once final fees are determined.  *Id.*; AFJ2, § IX(A),(F), 2001 WL 1589999, at *6-7.

## <u>CONCLUSION</u>

For the foregoing reasons, ASCAP respectfully requests that the Court fix annual interim license fees for public performances of ASCAP music by RMLC-represented radio stations commencing January 1, 2010, through the date upon which the Court sets a final license fee, in an amount no less than $232,175,000, the amount paid in the final year covered by the 2004 License as supplemented by the November 2008 Letter Agreement.

Respectfully submitted,

Dated: New York, New York          PAUL, WEISS, RIFKIND, WHARTON &
February 26, 2010                  GARRISON LLP

By_____/s/ Jay Cohen_____
        Jay Cohen
        Lynn B. Bayard
        Jacqueline P. Rubin
        Kristy M. Tillman
1285 Avenue of the Americas
New York, New York 10019-6064
Phone: (212) 373-3163
Email:  jaycohen@paulweiss.com;
lbayard@paulweiss.com; jrubin@paulweiss.com;
ktillman@paulweiss.com

Richard H. Reimer
Sam Mosenkis
Christine A. Pepe
American Society of Composers, Authors and
Publishers
One Lincoln Plaza
New York, New York 10023
Phone: (212) 621-6200
Fax: (212) 787-1381
Email:  rreimer@ascap.com;
smoseknis@ascap.com; cpepe@ascap.com

Attorneys for the American Society of Composers,
Authors and Publishers