UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application for the Determination of Interim License Fees for<br><br>THE CROMWELL GROUP, INC. AND AFFILIATES, ET AL.<br><br>Related to<br><br>UNITED STATES OF AMERICA,<br>           Plaintiff,<br>v.<br>AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,<br>           Defendant. | No. 10 CV 0167 (DLC) (MHD)<br><br>ECF Case<br><br><br><br>No. 41 CV 1395 (DLC) (MHD) |

**SUPPLEMENTAL MEMORANDUM OF CROMWELL GROUP, INC. AND AFFILIATES, ET AL. IN RESPONSE TO THE DECLARATION OF KEVIN M. MURPHY**

R. Bruce Rich (RBR 0313)
Jonathan Bloom (JB 7966)
Heather R. Solow (HRS 8680)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

*Counsel for the Radio Music License Committee and The Cromwell Group, Inc. and Affiliates, et al.*

With leave of the Court, Applicants submit this supplemental memorandum in response to the Declaration of Kevin M. Murphy, dated March 31, 2010 ("Murphy Declaration"), filed by ASCAP on April 2, 2010.

## INTRODUCTION

Although styled as responsive to Applicants' opening papers, the Murphy Declaration principally addresses an issue – the impact of declining revenues on a reasonable interim fee – that ASCAP has known to be central to Applicants' position since long before the parties' initial papers were filed. The timing of the filing of this declaration precludes a full and proper response to it, including by another expert economist. Even without the benefit of that opportunity, however, we note in this submission the striking inconsistency between the central tenets of the Murphy Declaration and ASCAP's longstanding prior advocacy of revenue-based fee-setting based on, inter alia, the fact that it accounts automatically for changes in economic conditions and, hence, in the value of the ASCAP license. That advocacy has helped shape this Court's rate-setting jurisprudence. The 180 degree change of position reflected in Professor Murphy's filing attests to ASCAP's inability to defend the current levels of radio industry license fees on the grounds it has espoused in all prior court filings of which Applicants are aware.

## DISCUSSION

### A. Professor Murphy's Thesis

Professor Murphy states that he was asked to respond to Applicants' argument that "the recent decline in radio industry revenue requires a reduction in interim fees of more than $100 million from the final fees paid in 2009." Murphy Decl. ¶ 9. His conclusion is that Applicants' interim fee proposal "does not make economic sense" and "does not rest on a sound economic analysis of the value of the ASCAP license." Id. ¶ 13. He opines that Applicants "[have] not

demonstrated that the industry's declining revenue reflects any change in the use of ASCAP music or the value of the ASCAP radio license." Id. A proper analysis, he asserts, "requires extensive economic analysis of changes in the radio industry, the amount of music used by the industry, and the manner in which the industry uses the music." Id. Professor Murphy goes on to assert that "a reduction in revenue does not necessarily correlate with a reduction in the value of the ASCAP public performance license." Id. ¶ 14. Revenues are "a particularly bad proxy," he continues, for valuing ASCAP fees for the radio industry's "new media offerings." Id. ¶ 13.

### B. ASCAP's Advocacy Elsewhere

ASCAP has for decades advocated precisely the *opposite* economic proposition to that advanced by Professor Murphy here. For example, in rate litigation asking this Court (Judge Conner) to impose a percent-of-revenue fee on the two broadcast television network applicants before the Court, Peter Boyle, ASCAP's chief economist (who has filed a declaration here as well) testified at trial that "the biggest advantage" of a revenue-based fee was that it "adjusts for a whole variety of changes and circumstances automatically." Sept. 14, 1992 Testimony of Peter Boyle, United States v. Am. Soc'y of Composers, Authors and Publishers (In the Matter of the Application of Capital Cities/ABC, Inc. and CBS, Inc.) ("Capital Cities/ABC"), Tr. 40:11-12 (Declaration of Heather R. Solow, dated April 12, 2010 ("Solow Decl."), Ex. A). See also id. 82:18-19 ("All . . . types of changes are going to be incorporated into the revenue of the networks."). Mr. Boyle noted specifically that a revenue-based fee "adjusts for changes in economic conditions." Id. 42:12-17. ASCAP's then expert economist Sherwin Rosen (who was Chairman of the University of Chicago economics department on whose faculty Professor Murphy sits), testified similarly that "revenue reflects kind of the whole situation," Sept. 15, 1992 Testimony of Sherwin Rosen, Capital Cities/ABC, Tr. 196:21-197:3 (Solow Decl. Ex. B),

and that a percentage-of-revenue license "takes account of changing circumstances that can't really be anticipated . . . ." Id. 198:23-199:8.

Based at least in part on this advocacy, the Court in that litigation, while declining to set a revenue-based fee, explained its reasoning for relying on changes in the networks' revenues as a touchstone for measuring relevant economic change:

> [A] formula that allows for fluctuations in gross revenues takes into account a host of considerations. It adjusts automatically for the changes in the economy . . . as well as changes in the financial fortunes of the network, such as the consequences of competition from other sources of home entertainment. . . . It accounts for the financial effect on the network of variations in viewership or audience share. . . . On a forward-looking basis, it allows for a complex of changing circumstances that cannot be anticipated and shares between the parties the risk therefrom. . . . In short, gauging the changes in gross revenue provides a practical proxy by which to incorporate a range of considerations.

Capital Cities/ABC, 831 F. Supp. 137, 158 (S.D.N.Y. 1993).

In a prior Capital Cities/ABC proceeding, ASCAP asserted even more explicitly that the "'value' of the rights acquired under the ASCAP blanket license has been . . . *exclusively* . . . measured as a function of the station's revenues," ASCAP's Post-Trial Brief, dated May 24, 1991, In the Matter of the Application of Capital Cities/ABC, Inc., CBS Inc., and National Broadcasting Company, Inc., No. Civ. 13-95 (WCC) (S.D.N.Y), at 45 (Solow Decl. Ex. C) (emphasis in original), and that "the fees paid to ASCAP members *should* change in direct proportion to changes in the stations' revenues from the sale of their programs." Id. at 47 (emphasis in original).

ASCAP's advocacy in the television network rate proceedings has been replicated in other rate proceedings. In a proceeding under Section 118 of the Copyright Act to determine a statutory license rate for noncommercial educational broadcasters, for example, ASCAP advocated a percentage-of-revenue rate equivalent to that paid by commercial broadcasters based

3

on its reflecting the market value of the use of ASCAP music. See Direct Case of the American Society of Composers, Authors and Publishers, dated September 30, 1997, In the Matter of the Rates for Noncommercial Education Broadcasting Compulsory License, Docket No. 96-6 CARP-NCBRA, at 6-7 (Solow Decl. Ex. D). Based in part on that argumentation, the arbitration panel concluded that "in addition to change in music share, the change in Public Broadcasters' revenues is the best indicator of relevant changed circumstances which require an adjustment of the chosen benchmark." Report of the Panel, In the Matter of the Rates for Noncommercial Education Broadcasting Compulsory License, Docket No. 96-6 CARP-NCBRA (July 22, 1998), at 27 (Solow Decl. Ex. E).

Even in relation to so-called "new media" offerings, as to which Professor Murphy suggests that revenues are a "particularly bad proxy" for valuing an ASCAP license, Professor Murphy's views are inconsistent with ASCAP's *current* advocacy in this Court and in the Second Circuit. In a multiplicity of "new media" rate cases with which the Court is familiar, ASCAP and its economists have consistently advocated revenue-based license fees – albeit at rate levels and concerning revenue bases that are sharply contested. In particular, in the pending appeal of the case ASCAP routinely cites as the litmus test for valuing "new media" uses of ASCAP music, ASCAP's briefing embraced the revenue-based license fees ASCAP advocated at trial without even a hint that they may be a "particularly bad proxy" for valuing an ASCAP license. See Reply and Cross-Appeal Response Brief for Defendant-Appellant-Cross-Appellee, dated October 9, 2009, United States v. Am. Soc'y of Composers, Authors and Publishers, No. 09-0539-cv(L) (2d Cir.), at 32-47 (Solow Decl. Ex. F).[1]

---

[1] At the trial of that case, the Court noted that "[t]he percentage-of-total-revenue formula has been used by ASCAP and approved by the courts for decades." In the Matter of the Application of America Online, Inc. ("AOL"), 562 F. Supp. 2d 413, 480 (S.D.N.Y. 2008).

Finally, the fact that Professor Murphy indicates the need to account for relevant changes in music use is beside the point. As we discuss in our April 2, 2010 memorandum, ASCAP's only proffer as to music use on this interim fee motion purports to demonstrate no change in music use during the relevant time period, and Applicants at this stage of the proceeding have not put music use into controversy.[2] Music use is, accordingly, a non-factor on this motion, leaving changed *economic* circumstances as the sole relevant criterion.

ASCAP is entitled to make whatever arguments it desires in support of the fee positions it believes to be reasonable. But it is ironic and telling that even as ASCAP urges the Court to maintain (its conception of) the economic status quo for the interim fee period, it relies on a radically new conception of valuation of the ASCAP license from an economist whose views, understandably, are couched as "incomplete," "subject to revision," and "preliminary." Murphy Decl. ¶ 26. In contrast, Applicants' interim fee position calls for a simple adjustment, based on industry revenue change, that is completely in line with ASCAP's longstanding guidepost for measuring changes in the value of the ASCAP license. For these reasons and those set forth in Applicants' February 26 and April 2 submissions, Applicants respectfully request that the Court afford them the interim fee reduction they seek.

New York, New York  
April 12, 2010

*R. Bruce Rich / HRS*  
R. Bruce Rich (RBR 0313)  
Jonathan Bloom (JB 7966)  
Heather R. Solow (HRS 8680)  
WEIL, GOTSHAL & MANGES LLP  
767 Fifth Avenue  
New York, NY 10153  
(212) 310-8000  
*Attorneys for the Radio Music License Committee and The Cromwell Group, Inc. and Affiliates, et al.*

---

[2] To the extent ASCAP's papers may be read as claiming that the radio industry is using more ASCAP music overall based on its use of various digital platforms, that claim is unsubstantiated.

5